UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RITA J. CINDRICH,                 :    **CIVIL NO. 1:03-CV-2282**
                                  :
          Plaintiff               :    (Judge Conner)
                                  :
       v.                         :    (Magistrate Judge Smyser)
                                  :
MICHAEL FISHER,                   :
THOMAS L. PALMER,                 :
MARK A. PACELLA,                  :
ALEXIS BARBIERI and               :
DONALD P. MINAHAN,                :
                                  :
          Defendants              :

### REPORT AND RECOMMENDATION

I. Background and Procedural History.

        The plaintiff, Rita J. Cindrich, commenced this action
by filing a complaint on December 15, 2003.  The defendants are
Michael Fisher, Thomas L. Palmer, Mark A. Pacella, Alexis
Barbieri, and Donald P. Minahan.  The plaintiff was a lawyer in
the Charitable Trusts Section of the Office of Attorney General
of Pennsylvania.  The defendants were the plaintiff's superiors
within the Office of Attorney General.  The plaintiff claims
that the defendants retaliated against her because of her
speech.

        On February 12, 2004, the defendants filed an answer to
the complaint.

The discovery period expired on January 12, 2005.

On March 31, 2005, the defendants filed a motion for summary judgment, a statement of undisputed material facts, a brief and documents in support of their motion.  After requesting and receiving two extensions of time, on May 16, 2005, the plaintiff filed a brief in opposition to the defendants' motion for summary judgment and a counterstatement of undisputed material facts.  On May 17, 2005, the plaintiff filed an amended counterstatement of undisputed material facts and documents in opposition to the defendants' motion for summary judgment.  On May 27, 2005, the defendants filed a reply brief.

For the reasons that follow it will be recommended that the defendants' motion for summary judgment be granted.

II.  Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

> [T]he plain language of Rule 56(c) mandates
> the entry of summary judgment, after adequate
> time for discovery and upon motion, against a

2

> party who fails to make a showing sufficient
> to establish the existence of an element
> essential to that party's case, and on which
> that party will bear the burden of proof at
> trial.  In such a situation, there can be "no
> genuine issue as to any material fact," since
> a complete failure of proof concerning an
> essential element of the nonmoving party's
> case necessarily renders all other facts
> immaterial.  The moving party is "entitled to
> a judgment as a matter of law" because the
> nonmoving party has failed to make a
> sufficient showing on an essential element of
> her case with respect to which she has the
> burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The moving party can discharge that burden by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, *supra*, 477 U.S. at 325.

An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party."  *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A material factual dispute is a dispute as to a factual issue that will affect the outcome of the trial under governing law.  *Anderson*, *supra*, 477 U.S. at 248.  In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the

non-moving party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

III.  Facts.

The following facts are either undisputed or are taken from the plaintiff's amended counterstatement of material facts.

The plaintiff was hired by the Office of Attorney General in July of 1993. *Defendants' Statement of Undisputed Material Facts at ¶2 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶2.*  At the times relevant to this case, defendant Fisher was the Attorney General of Pennsylvania and defendant Barbieri and defendant Minahan were Executive Deputy Attorney Generals.  *Id. at ¶¶6 & 7.*  The plaintiff worked in the Pittsburgh Office of the Charitable Trusts Section of the Office of Attorney General. *Id.* at ¶1.  At the time the plaintiff was hired, defendant Pacella was the attorney-in-charge of the Charitable Trusts Section in Pittsburgh and the plaintiff reported directly to defendant Pacella. *Id.* at ¶¶3 & 4.  Defendant Pacella was subsequently promoted to Chief of the Charitable Trusts Section and in November of 1999 he began to work full time in Harrisburg. *Id.* at ¶5.  In January of 2000, defendant Palmer replaced defendant Pacella as the attorney-in-charge of the Pittsburgh Office of the Charitable Trusts Section. *Id.* at ¶8.

4

The plaintiff accused defendant Palmer of treating her differently because of her gender. *Id.* at ¶15.  In a Memorandum dated September 29, 2000, the plaintiff requested defendants Pacella and Barbieri to review the Performance Evaluation Report prepared by defendant Palmer concerning her performance for the period July 1, 1999 to June 30, 2000.  *Doc. 33, Exhibit 5.*  The plaintiff indicated that the Performance Evaluation Report was not a fair indication of her performance. *Id.*  The plaintiff also indicated that she believes that defendant Palmer's decision not to recommend her for a promotion was in retaliation for her disobeying him by expressing her opinion in a memo she authored and forwarded to defendant Pacella on June 26, 2000. *Id.*

In October of 2000, defendant Palmer recommended the plaintiff for a promotion. *Defendants' Statement of Undisputed Material Facts at ¶19 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶19.*  As a result of that recommendation, the plaintiff indicated that she wanted to drop the issue which had arisen between her and Palmer in June of 2000. *Id.*  The plaintiff, however, did not receive the promotion and in an e-mail dated February 16, 2001, she complained to defendant Pacella about her small case load and about the routine nature of the cases assigned to her. *Doc. 33, Exhibit 9.*  She stated that she believed that defendant Palmer was punishing her for the matter that arose in June of 2000 and she requested an investigation. *Id.*  She stated that "[t]he subtle pattern of discrimination/intimidation has

continued and is always present." *Id.*  She copied this e-mail
to defendant Barbieri and First Deputy Attorney General Gerald
Pappert. *Id.*

    After defendant Palmer reported that a private attorney
had complained about the plaintiff, in an e-mail dated March
22, 2001 addressed to defendants Palmer and Barbieri, the
plaintiff requested to know the details of the complaint. *Doc.
33, Exhibit 10.*  The plaintiff accused defendant Palmer of
making a habit of disparaging her professional reputation. *Id.*
She copied this e-mail to defendant Pacella. *Id.*  Defendant
Palmer responded to the plaintiff's e-mail by providing details
regarding the complaints against her and by telling her that he
viewed the complaints from opposing counsel as unfounded and
that the complaints had not affected his view of her opinions,
work product or competence.  *Doc. 33, Exhibit 11.*  The
plaintiff apparently was still upset that the complaint had
been disclosed to those higher in the chain of command, and in
an e-mail dated March 23, 2002 to Palmer she stated:

> The real problem and you do not appear to
> be getting the message is that Here IS ANOTHER
> PAGE OF UNSUBSTANTIATED COMPLAINTS being
> forwarded to my supervisors, AGAIN.  WHAT WILL
> IT TAKE TO GET YOU TO UNDERSTAND THAT YOU
> CANNOT CONTINUE TO DISPARAGE MY PROFESSIONAL
> REPUTATION IN THIS MANNER? You are not
> protecting me from any complaints. YOU ARE THE
> SOURCE AND THE MOUTHPIECE.

In her March 23, 2001 e-mail the plaintiff also discussed
issues that she felt were ethical problems. *Plaintiff's Amended
Counterstatement of Undisputed Material Facts at ¶24.*  With
respect to a particular case she stated:

6

> A further problem that you should bring
> to Weisgerber's attention is that he provides
> this information after the hospital closed,
> after the real estate is sold, after the money
> is spent . . . He is making us look like
> Mickey Mouse so that you can continue to be
> Mr. Popular.  But, let me make clear, the one
> thing you can not do is shove the
> responsibility for this on me – you have had
> contact with Weisgerber, you have discussions,
> you are the Attorney in Charge.  The file has
> no mention of those discussions or the
> information obtained.  So if you know more,
> make your contribution.

*Doc. 33, Exhibit 12.*  The plaintiff also asked Palmer if he

recalls that "we have two complaints from local citizens

inquiring into the disposition of proceeds?" *Id.*  She also

discussed other issues and asked: "DO YOU NOT RECOGNIZE THESE

ISSUES OR DON'T THEY BOTHER YOU?" *Id.*  With respect to a

different case the plaintiff accused defendant Palmer of

intimidating and frightening her from presenting the facts. *Id.*

She stated:

> You warned me not to send a memo.  You also
> threatened me not to send it.  The next day,
> after it was sent you said Jerry Pappert
> removed me from the case because a complaint
> was received.  When I demanded to know the
> name of the complainant, the content of the
> complaint and the date of the complaint, I was
> told it was more in the nature of an inquiry
> and that I was not removed from the case.  I
> will go to my grave believing that Leroy
> Zimmerman did not on his own initiative call
> to complain about me, if there was even a
> call.  You made me a victim, to discredit me
> in the eyes of my supervisors and have me
> removed from the case.  You bragged to the
> other attorneys on the case that you would
> resolve this, that the Attorney General
> personally directed you to settle this matter.
> Then you made good on your threat.  I was
> frightened to lose the career I loved.  I
> cried for weeks and was sick for weeks
> thereafter.  I wrote 200 memos that I never
> sent because I did not want this matter

> publicly aired.  If you persist. I will
> persist.

*Id.*  The plaintiff also stated:

> Every time I discuss a matter with CDAG
> Pacella, I am not plotting about you or to go
> above you.  You should also know that I am not
> going to be intimidated or back down when I
> know something is not right.  It is my
> obligation to protect the General and this
> office's reputation by fulfilling our duties.
> When I can see something you don't, if you
> will not listen, I am going to tell whoever I
> can find in the chain of command that will
> listen.  If I am more conscientious than you,
> too bad.  I am only doing what our most
> conscientious Chief taught me.  If our
> procedures change, I will follow them and not
> ask for this information. I would like to
> continue working with this office but only if
> these issues can be resolved so that I can
> continue to respect this office, myself and
> this position.

*Id.*  The plaintiff copied this e-mail to defendants Pacella and

Barbieri. *Id.*

By an e-mail dated April 4, 2001, the plaintiff accused

defendant Palmer of dumping routine and meaningless cases on

her and assigning her active cases to other attorneys.  *Doc.*

*33, Exhibit 13.*  She copied this e-mail to defendants Pacella

and Barbieri. *Id.*

On April 5, 2001, defendant Pacella directed the

plaintiff to discontinue copying defendant Barbieri on her e-

mails. *Doc. 33, Exhibit 14.*

On April 9, 2001, defendant Palmer reported to

defendant Pacella that at a staff meeting the plaintiff was

8

belligerent and accused him of cheating under the new case
assignment system. *Doc. 33, Exhibit 15.*  He stated that she
essentially called him a liar and cheat in front of the rest of
his staff. *Id.*  He also reported that she had violated the
chain of command and that she was not permitting him to review
letters that she was sending out. *Defendants' Statement of
Undisputed Material Facts at ¶27 and the Plaintiff's Amended
Counterstatement of Undisputed Material Facts at ¶27.*  Further,
he reported that she had rejected an assigned file because she
said she could not work with him. *Id.*

On July 19, 2001, the plaintiff brought to defendant
Palmer's attention an issue in the case of *Estate of James B
Sprague* and expressed her feeling that "we are bound by office
policy to object to relief."  *Id.* at ¶29.  In response,
defendant Palmer directed plaintiff to draft a Reply for his
review by August 10, 2001 and stated that that will give him
time to deal with the policy issues, if any.  *Doc. 33, Exhibit
17.*  The plaintiff responded by stating in an e-mail to Palmer:

> You wouldn't know a policy issue if it
> "slammed" you in the face.
>
> Notwithstanding all of that, you are the AIC.
> If you have a strong feeling about this case
> and want to assume a position that goes
> contrary to what I know our office's position
> should be, tell me today.
>
> I will gratefully assign the file over to you.
> The one option that is not available is to
> have me work through this file, only to fight
> with you and the opponent to preserve the
> integrity of the Office.
>
> If you have a personal feel for this file
> and/or want to deliver a favor to someone, say

9

> so now.  You can have the file to handle in
> the manner you deem appropriate.
>
> Otherwise it is my understanding that on the
> basis of the information I provided yesterday,
> you are approving objections to the case.  If
> I write those objections, those objections are
> available for editing, but make no mistake
> those objections will be filed . . . .
>
> TLP, you have to respect an individual to
> receive that individual's respect.  It doesn't
> just keep on coming.
>
> Please promptly advise whether you want the
> file or I am to begin work on objections.

*Doc. 33, Exhibit 18 (ellipsis in original).*  In another e-mail

on the same subject sent the same morning, the plaintiff said

the following to Palmer:

> The offer is open to you to review the file to
> determine if you agree objections are
> appropriate.  If you determine they are
> appropriate, I will draft the objections on
> whatever basis you believe is appropriate.
> What I am trying to make clear is that there
> is no option available to you that will have
> me draft the objections for you to criticize
> and undermine at a later date.  Objections are
> appropriate or they are not.
>
> I will not jump through hoops for your
> enjoyment.  I will not allow you any more
> opportunities for my name to be associated
> with a matter that is an embarassment [sic] to
> me or this office.  Either you want to file
> objections or you do not.  Make up your mind.
> I haven't spent any time with the file and
> have not formed an opinion.  I can easily and
> with a clear conscience give you the file to
> do as you please.  Once I review the file,
> however, and know the appropriate result, I am
> not going to sell you on my view and attempt
> to persuade a kangaroo court.
>
> You are the AIC, tell me your view and the
> basis of your objections, if any.  The file is
> on your desk.  The matter is not rocket-
> scientist material.  I will then follow your
> suggestions and prepare objections along the
> lines you suggest.  If in your wisdom, you
> determine objections are not appropriate, then

> please distance me from the case and handle
> the matter as you desire.

*Doc. 33, Exhibit 19.*

On July 20, 2001, defendant Palmer directed the plaintiff to prepare a draft objection or a memo indicating her opposition to a Petition for Distribution on First and Partial Account in the *Hewitt* case. *Defendants' Statement of Undisputed Material Facts at ¶32 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶32.* In an e-mail response, the plaintiff discussed some issues in the *Hewitt* case and stated that she was unwilling to compromise "on the basis of an internal Reed Smith Memo of how they hope some regulation should apply five years after the trust was funded." *Doc. 33, Exhibit 21.* She further stated that a voluntary underpayment occasioning an award of $271,379.96 to the co-trustee in 2001 raises an appearance of impropriety that she has a problem condoning. *Id.* She stated that Palmer had a "preconceived notion that whatever Reed Smith offers is correct." *Id.* She also accused Palmer of not respecting her view or credibility. *Id.*

In July of 2001, defendant Pacella met with the plaintiff to discuss her concerns about defendant Palmer and to discuss her practice of e-mailing him and Barbieri. *Defendants' Statement of Undisputed Material Facts at ¶35 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶35.* On August 6, 2001, Pacella memorialized in a memo to the plaintiff the discussion he had with her concerning

11

her refusals to draft objections and/or memoranda requested by
Palmer in the *Sprague* and *Hewitt* cases. *Id.* at ¶36.  He told
her that future failures to follow Palmer's instructions could
constitute insubordination and subject her to disciplinary
action. *Id.*  He also explained the chain of command and said,
among other things, that "you should secure prior approval
before communicating with Executive Deputies Attorneys General
Alexis L. Barbieri and Donald P. Minahan on any case or
personal problem, unless you are contacted directly by either
of them or whenever I am the subject of your concern." *Id.*
Defendant Pacella's August 6, 2001 memo caused the plaintiff to
be in tears for three weeks after she saw it. *Id.* at ¶38.  The
plaintiff considered the statement by Pacella that she was not
to contact Barbieri or Minahan on any case or personal problem
unless they contacted her first to be very strong words for
defendant Pacella to use.  *Plaintiff's Amended Counterstatement
of Undisputed Material Facts at ¶38.*  She testified that she
felt like a lady without a land. *Id.*

On April 9, 2002, the plaintiff wrote a memorandum
analyzing the Pennsylvania Supreme Court's opinion in the
*Hewitt* case. *Doc. 33, Exhibit 26.*  Her position was that the
Commonwealth was successful in its appeal in that case. *Id.*
Defendant Pacella did not agree with plaintiff's interpretation
of the Pennsylvania Supreme Court's opinion.  *Doc. 33, Exhibit
27.*  He testified that the plaintiff's contention that the
Commonwealth had won in *Hewitt* was disconcerting to him because
he knew that it had lost the case and that her contention

caused him to have concerns about her performance. *Doc. 33, Exhibit 1 at* 44-45.  On April 12, 2002, the plaintiff asked to be removed from the *Hewitt* case and her request was approved. *Defendants' Statement of Undisputed Material Facts at ¶47 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶47.*

On October 22 and 23, 2002, the plaintiff and defendant Pacella exchanged a series of e-mails concerning the *Hewitt* and *Love* cases. *Id.* at ¶48.  The plaintiff accused defendant Palmer of practicing law under her name while handling the *Hewitt* case, indicated that she was "frightened to be involved in this kind of a matter," and requested protection under the Whistleblower law. *Doc. 33, Exhibit 30.*  Among other things, Pacella reminded the plaintiff of the chain of command and added defendant Fisher and First Deputy Attorney General Pappert as individuals that she needed to seek prior approval to contact. *Id.*

On October 23, 2002, the plaintiff provided her opinion to defendant Pacella that the assignment of a specific case to her, the disappearance of a record on remand from the Pennsylvania Supreme Court, and the determination of a master not to write a report were all calculated to cause her stress and professional embarrassment. *Defendants' Statement of Undisputed Material Facts at ¶50 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶50.*

In an October 30, 2002 e-mail to defendant Pacella, the
plaintiff wrote that if the Office of Attorney General does not
conduct an internal investigation into the assignment of the
*Love* case to her, she will "seek private counsel with regard to
what" she has suffered. *Id.* at ¶52.  In that same e-mail she
said she can not work with Palmer. *Id.*  She concluded this e-
mail as follows:

> Please do not make me the victim any longer. I
> have been in tears for the last month, not
> knowing whether I am the victim or a malicious
> hoax or inadvertently participating in
> wrongdoing.  I work so hard to do a proper
> review.  But, no matter what I did I was
> embarrassed and humiliated.  I stayed
> detached, that is why Jan Marks berated me,
> pick up the pencil, do the math, my kid can do
> the math. . .  Larry receives information, but
> does not share it.  I cannot concentrate or
> think any longer.
>
> I am afraid of him.  He just came to the door
> and I have kept it locked.  He said it was
> him, he has a book for me.  A book?  After
> what I have endured?  There was a slamming
> sound.  I have not opened the door.
>
> Please don't make me sign on another case with
> him.

*Id.(ellipsis in original).*  When the plaintiff wrote in her e-
mail that she had been crying, she meant that literally rather
than figuratively. *Id.* at ¶53.

On November 14, 2002, the plaintiff sent a e-mail to
defendant Pacella in which she stated that she thinks someone
else in the Pittsburgh office was involved in the wrongdoing
and that an internal investigation is warranted. *Doc. 33,
Exhibit* 35.  She also stated:

14

> You never placed me at the bottom of a black
> pit or made me feel guilty if I didn't have
> the right answer.  Do you realize I still do
> not know the underlying facts of *Hewitt*? I
> stayed overnight at this office many nights,
> thinking that if I worked harder, I would
> understand the case.  The self doubt became so
> bad that I could not type a pleading.  I kept
> second-guessing myself and blaming myself for
> some imagined shortcoming.

*Id.*

In February of 2003, defendant Palmer sent the
plaintiff an e-mail recognizing her work in the *Conneaut Lake
Park* (an amusement park) case and crediting her for "the
victory for the public." *Doc. 33, Exhibit 36.*  In that e-mail
he also joked about positions available in the park in the
popcorn trailer, the animal maintenance department and in the
DIP concession. *Id.*  The plaintiff did not view the e-mail as
praise for the job she had done on the case.  *Defendants'
Statement of Undisputed Material Facts at ¶56 and the
Plaintiff's Amended Counterstatement of Undisputed Material
Facts at ¶56.*  Rather, she viewed it as part of an effort to
gaslight[1] her, as an intentional form of emotional distress, and
as an effort to discount her achievements.  *Id.*

In March of 2003, the plaintiff and defendants Palmer
and Pacella exchanged a series of e-mails relating to the
actions that should be taken by the Commonwealth with respect

---

[1] The plaintiff uses the term "gaslight" to refer to an attempt
to drive her insane.  The term is derived from the movie *Gaslight,*
which, according to the plaintiff, is about a man who tries to
drive his wife insane. *See Infra page 23.*

15

to the *Laubach* case. *Defendants' Statement of Undisputed Material Facts at ¶57-60 and the Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶57-60.* On March 13, 2003, after reviewing the *Laubach* file, the plaintiff reported that there were problems with the account for the estate and asked if she had authority to file a Petition for Distribution on Partial Account and to assert a breach of fiduciary obligations, breach of duty of loyalty, waste of estate assets, breach of shareholder agreement, and violation of duty of good faith and fair dealing. *Id.* at ¶67. Defendant Pacella responded by stating that he would rather ask the executors to file a Second and Final Account and, if they refused, to file a Petition for Final Accounting. *Id.* at ¶68.

On March 28, 2003, Timothy Burke, an attorney who represented the executors of the Laubach estate, contacted Judge Kelly's chambers to seek a time for a hearing to disclose to the court that he had concluded that the executors had paid federal estate taxes unnecessarily. *Id.* at ¶69. Burke then tried to notify the plaintiff of the hearing but was told she was in a meeting and could not be disturbed. *Id.* at ¶70. Burke needed a representative of the Office of Attorney General present at the hearing so he contacted defendant Palmer. *Id.* at ¶71. Defendant Palmer then looked for and located the plaintiff in a conference room with an attorney named Rita Joyce. *Id.* at ¶72. The plaintiff was meeting with Joyce regarding the *Laubach* case. *Id.* at ¶74. When Palmer arrived at the conference room, he explained that the plaintiff needed to

16

appear in court quickly. *Id.* at ¶75.  Joyce was invited to come along. *Id.*  The plaintiff did not readily get up to leave as did Palmer and Joyce. *Id.* at ¶76.  Rather, she questioned why she was required to go to court on such short notice, to which defendant Palmer responded he did not know. *Id.*  The plaintiff appeared upset about being told she needed to go to court, that Palmer had been notified, and that she had not been notified. *Id.* at ¶77.  Joyce described the plaintiff as agitated. *Id.* at ¶78.

As Joyce, the plaintiff, and defendant Palmer walked to the courthouse, the plaintiff continued to ask Palmer the reason for the hearing and Palmer responded that he did not know.  *Id.* at ¶79.  Joyce testified that she would not have behaved in public the way the plaintiff behaved toward Palmer. *Id.* at ¶81.  Joyce testified that she viewed the plaintiff's conduct toward Palmer to be unusual and bizarre. *Id.* at ¶82.

Defendant Palmer reported to defendant Pacella about the events surrounding the hearing on March 28, 2003 and said that the plaintiff embarrassed him in front of counsel and the court. *Id.* at ¶83.  He also said that the plaintiff embarrassed the Office by failing to comprehend what was happening at the hearing and by failing to understand the significance of the hearing. *Id.*  He also said that "[a]s a trial lawyer for 30 years, I am quite used to being insulted, but rarely from those working under my supervision." *Id.*

17

On March 28, 2003, following the hearing, the plaintiff informed defendant Palmer that she would "not tolerate counsel's go-behind my back tactics ...." *Id.* at ¶84. Defendant Palmer responded to the plaintiff's comment by explaining how the hearing came about. *Id.* at ¶85.

The plaintiff believes Palmer knew about the hearing and knew about the issues to be presented at the hearing prior to March 28, 2003. *Id.* at ¶86. She also claims to have heard rumors that defendant Palmer had been coaching witnesses to say that the call regarding the hearing came in on the morning of the hearing. *Id.* at ¶87. When asked the source of those rumors, she could not recall. *Id.*

During the evening of Friday, March 28, 2003, the plaintiff sent an e-mail to Palmer which said, among other things:

> The options available to you are that you can have me fired for doing what I believe and know is right, or you don't have to assign me any more cases. I will come to work and polish my nails or whatever. You do not have an option to discredit me in the eyes of this office or my peers.
>
> It was at your direction that you attended the last meeting ("Rita, I will attend") and you embarrassed me. You insisted that I verbalize my objections and subjected each one to ridicule. In front of opposing counsel, you created the appearance my objections were unfounded and reduced me to a fool. You intimidated me and undermined my self-confidence.
>
> . . .

It was only 10:20 or 10:25 a.m. this morning
when you learned of the emergency meeting.
You needed only to call me out of the
conference, advise me a meeting was scheduled
for 11:00 a.m., and I would have been there or
asked you to cover.  You could simply have
told me in a professional manner the substance
of the "emergency meeting."

Instead you created the appearance I was in
for a reprimand and with great glee, whisked
me to the court like I was some child, without
a purse, lipstick or keys to get back in the
office, so we could stand around for twenty
minutes wondering what was happening, while
you had a great laugh. I didn't need the drama
or perhaps you thought you needed the element
of surprise.  You also couldn't resist the
opportunity to undermine my credibility in
front of Ms. Joyce.

. . .

Everywhere I looked there was another
incredulous representation.  Come to think of
it, several cases have been that way since you
have been here.

. . .

You do not treat the men in this office in
this manner and it is not appropriate to treat
me in this fashion. No man that may read this
e-mail would want their wife or daughter(s) to
endure the treatment I have suffered for the
last three years.  You would not want your
wife or daughters in law to be treated in this
fashion. Attorney General Fisher would not
want his wife or daughter to be treated in
this manner.  First Deputy Attorney General
Pappert, CDAG Pacella, Mr. Minahan, none of
them would want their wife or daughter(s)
subject to the treatment you have afforded me.
I have suffered physically, emotionally and
professionally, but make no mistake, I will
not quit.  Quitting is not an option. Quitting
was never an option for my father, my mother,
my brothers or my husband.  And it is not an
option for me.

I looked forward to your coming here and you
have made it a living hell.  But I am learning
and succeeding despite you.  If you were not
aware your treatment is intolerable, you are

>       aware of it now.  I expect it to stop from
>       this day forward.
>
>       Well, what do you think now?  Am I cut out to
>       be an attorney or what?
>
>       On a brighter note, since Tim Burke advised he
>       will object to our objections and I should
>       have requested leave of Court to add
>       supplemental objections (I perceived the
>       Court's order as granting leave), in light of
>       the executors' new admissions, I think the
>       Fraud is evident, shall I file a petition for
>       leave of Court to grant permission to Amend
>       our objections? Will we lose our rights?
>
>       I would greatly appreciate an answer to this
>       question - not the usual hum hum hum.  You
>       were there, today.  You were instrumental in
>       arranging this emergency meeting on the
>       record.  You have never once guided me or
>       offered help in any matter as a Supervisor
>       should have. I have asked for your help
>       hundreds of times and you have refused.
>
>       It is probably a good thing the employees
>       don't evaluate the supervisors, isn't it?

*Id.* at ¶88 and *Doc. 33, Exhibit 45.*   On Saturday, March 29,
2003, at 12:14 pm, the plaintiff e-mailed defendants Palmer and
Pacella to ask what was the emergency meeting, why was there an
emergency meeting, whether the Commonwealth was required to
file objections, and whether there was an order entered.
*Defendants' Statement of Undisputed Material Facts at ¶89 and
the Plaintiff's Amended Counterstatement of Undisputed Material
Facts at ¶89.*  She also referred to the emergency meeting as
something that "Larry arranged." *Id.*  Thirty-eight minutes
later, the plaintiff e-mailed another message to defendants
Palmer and Pacella which started with the question, "EXACTLY
WHAT WAS THE PRESSING AND DISTRESSING MATTER ON THE LAUBACH
FILE?" *Id.* at ¶90. She concluded her e-mail with the statement,
"I can think of no reason for an 'Emergency Hearing' yesterday

and am getting sick to my stomach thinking of this." *Id.*  On Sunday, March 30, 2003, the plaintiff sent another e-mail asking about the March 28th hearing and said, "Don't tell me Larry doesn't know what is going on.  Much to my chagrin, he was involved in this case throughout and instrumental in arranging the surprise.  During the last two weeks, I stayed overnight working in this office until 4:00 a.m. or 5:00 a.m. to put this case together.  There will be full and fair disclosure in this matter."  *Id.* at ¶91.  Defendant Palmer responded to the plaintiff's March 30th e-mail and explained what happened at the March 28th hearing. *Id.* at ¶92. In that e-mail, Palmer discussed the objections the plaintiff had filed in the *Laubach* case stating: "You filed your last objections without consulting me as to their content and without giving me any opportunity to look at them.  I have no idea of the merit or relevancy of any of your most recent objections even though they bear my name along with Mr. Pacella's name.  The last thing I suggested is that you should ask the Executors to file a final account so we could move this case to a conclusion." *Id.*  He also pointed out that the proceeding on the 28th had nothing to do with her objections. *Id.*

On April 1, 2003, the plaintiff accused defendant Palmer of using her either as the instrument of a crime or malpractice, of "hanging [her] out there," and of influencing cases such that she did not know whether she was "the victim of a hoax or an unwilling participant in a crime." *Id.* at ¶95. She also claimed that Palmer participated in the March 28, 2003

hearing "on opposing counsel's behalf solely to embarrass" her and subject her to potential disciplinary problems. *Id.*  She requested a full investigation of Palmer's actions. *Id.*

On April 18, 2003, defendant Pacella informed defendant Barbieri and Bruce Sartechi, Director of Human Resources, about the plaintiff's ongoing complaints about defendant Palmer and about how he had investigated the plaintiff's complaints about Palmer once before and found them to be without basis. *Id.* at ¶178.  He explained his view of why the plaintiff and defendant Palmer cannot work together, and concluded that though he once believed that their situation would resolve over time, he now doubted "they can ever effectively work together." *Id.*

Between April 21 and April 29, 2003, the plaintiff and defendant Pacella exchanged a series of e-mails concerning the import of the March 28, 2003 *Laubach* hearing. *Id.* at ¶101.  The e-mails defendant Pacella sent to the plaintiff following the March 28, 2003 hearing concerning the *Laubach* case were, in the view of the plaintiff, part of Pacella's efforts to gaslight her. *Id.* at ¶102.   The plaintiff believes defendant Pacella did not listen to her concerns about the *Laubach* case. *Id.* at ¶103.  In the plaintiff's opinion, defendant Pacella began gaslighting her when he sent her the memo concerning the chain of command in 2001. *Id.* at ¶104.

Defendant Pacella told the plaintiff on April 30, 2003 that the office was taking her complaints about defendant Palmer very seriously, but that she needed to come up with specific examples and as much support for her allegations as possible. *Id.* at ¶105. During the Spring of 2003, defendants Pacella and Barbieri decided to set up a meeting with the plaintiff. *Id.* at ¶106.  Attempts were made as early as May 21, 2003 to schedule the meeting with the plaintiff.  *Id.* at ¶107.

A meeting was scheduled to occur on June 3, 2003 in Harrisburg, but, due to an accident on the turnpike, the meeting did not occur. *Id.* at ¶108.  While on the turnpike, the plaintiff called defendant Barbieri on the phone. *Plaintiff's Counterstatement of Undisputed Material Facts* at ¶108.  In response to statements made by the plaintiff concerning the appropriateness of actions on the part of the defendants, Barbieri told the plaintiff to watch the movie *Gaslight.* According to the plaintiff, the movie *Gaslight* is about a man who tries to drive his wife insane. *Id.*  The plaintiff inferred that defendant Barbieri was informing her that people in the office were intentionally trying to drive her insane. *Id.*

On June 17, 2003, the plaintiff informed defendants Barbieri and Pacella that defendant Palmer was part of a conspiracy to defeat the public interest. *Id.* at ¶113.  On June 18, 2003, the plaintiff e-mailed defendant Pacella and said, among other things:

23

The time for talk has long since expired.
Since you did not affirmatively state that you
did not reveal my e-mail to Larry, I must
believe that you did.

You walked me through hell and I barely
survived. . . . You and Larry are the most
despicable form of law enforcement there is.
All of the attorneys involved in the
conspiracy have abandoned it, except for you
and Larry.

Larry could have taken this case and done as
he pleased.  But he wasn't man enough and that
wasn't his plan.  His plan was to break me, to
discredit me in the eyes of this office and of
the court.  And with your help he almost did.

Attorneys Fulton and Burke abandoned the
conspiracy. Attorneys Reis, Gentile, and
Katarincic abandoned it. When I told Attorney
Reis that I knew - Attorney Katarincic ran to
settle Noble Dick. The only parties left are
you and Larry.

The only party that will be hurt if we do not
reveal this information to the court is me and
I have suffered enough. I took an oath. I will
uphold that oath. There is nothing left you
can do to me.  Buzz Hutchison was put in place
to protect you and Larry and to further
destroy me.  Was the plan to require me to
answer those questions and then to say that I
knew all the time?  A bit of public
embarassment [sic]? I know that was the plan.

The only issue for debate is how do we get
this information before the court.  My
recommendation is that we call an emergency
meeting let the parties state what has
occurred and file an account and get on with
it.

I was within a second of a nervous breakdown -
and may have had one.  The realization that I
was involved and made an unwilling participant
in some kind of an offense that I didn't even
know the name let alone the elements.  It was
a game to Larry.  It was my life.  Did you all
laugh about how you played with my mind? Was
this how you spent your time?  Ha! Ha! Ha!
Was it all a big joke?  How about the
promotion for me that was never a promotion?
How about all the viciousness? Do you really

> think I could forgive, forget or listen to
> your drabble again?

*Id.* at ¶114 (ellipsis in original).  Defendant Pacella

testified that he became concerned at this time that he had

lost his relationship with the plaintiff.  *Id.* at ¶115.

During the Spring of 2003, the plaintiff had met with

Attorney General Fisher in Pittsburgh.  *Id.* at ¶119.  During the

course of the meeting, the discussion turned to the *Laubach*

case and the plaintiff started to cry.  *Id.*  On the Saturday

following her meeting with defendant Fisher, the plaintiff went

into her office around noon and did not come out of the office

until Monday morning.  *Id.* at ¶120.

A meeting with the plaintiff was scheduled for June 24,

2003.  *Id.* at ¶116.  The day before the meeting, defendant

Barbieri explained that the purpose for the meeting was to

discuss the difficulties the plaintiff was having handling her

cases and the allegations she had made about other attorneys in

the Office of Attorney General.  *Id.*  Defendant Barbieri

reminded the plaintiff that she had asked for documentation to

support the plaintiff's allegations.  *Id.*  The plaintiff tried

to put the meeting off until the end of the Summer, saying it

was her preference to enjoy the rest of the Summer and in the

interim, she would gather the documents necessary to support

her contentions.  *Id.*  Defendant Barbieri asked the plaintiff

many times for support for the plaintiff's allegations, but the

plaintiff never provided any to her.  *Id.* at ¶117.  According to

defendant Pacella, the purposes of the June 24, 2003 meeting
were to discuss 1) the plaintiff's concerns about the *Laubach*
case, 2) her allegations of corruption and misconduct within
the Office of Attorney General, and 3) her welfare.  *Id.* at
¶118.

The meeting on June 24, 2003 was attended by defendant
Barbieri, defendant Pacella, the plaintiff, and the plaintiff's
husband. *Id.* at ¶124.  At the meeting, the *Laubach* case was
discussed as were the plaintiff's complaints about defendant
Palmer and the possibility of transferring the plaintiff to a
different section. *Id.*  Defendant Barbieri told the plaintiff
she wanted her to take six weeks off. *Id.*  The plaintiff
believes that defendants Barbieri and Pacella met with her to
prevent her from filing an answer to the Laubach Estate's
motion. *Id.* at ¶126.  On June 27, 2003, the plaintiff e-mailed
Barbieri to thank her for her help and said, "Words will never
express how much you helped or how close I was to falling into
a danger zone that I may never have escaped." *Id.* at ¶127.
June 27, 2003 was to be the plaintiff's last day in the office
for six weeks. *Id.* at ¶128.

The plaintiff returned to the office from her leave
during the second week of August, 2003. *Id.* at ¶129.  Following
her return to work in August, the plaintiff was contacted by
the Court regarding the *Laubach* case and asked whether an
answer to the Estate's motion to amend was going to be filed.
*Id.* at ¶132. The plaintiff referred the call to defendant

26

Pacella. *Id.* at ¶134.  The plaintiff then filed a motion to
withdraw her appearance from the *Laubach* case. *Id.* at ¶135.

Defendant Pacella had given instructions, prior to the
time the plaintiff filed her motion to withdraw, that all
documents that came into the office in the *Laubach* case were to
be forwarded to his attention in Harrisburg. *Id.* at ¶136.
Pursuant to that instruction, when the order granting the
plaintiff's motion for leave to withdraw arrived, it was
forwarded to defendant Pacella. *Id.* at ¶137.  The order
included language directing the plaintiff to serve a copy of
the order on all counsel. *Id.* at ¶138.  Defendant Pacella
notified the plaintiff by e-mail that he would take care of
serving the parties. *Id.* at ¶139.  The plaintiff responded to
defendant Pacella by telling him he did not have her permission
to send anything out on her behalf and directing him not to do
so. *Id.* at ¶140.  She also wrote: "I would first like to
confirm with the Court that the motion is the motion I
presented." *Id.*  Defendant Pacella responded that he had
already served the order, but that the plaintiff could also
serve it if she wanted to do so. *Id.*  The plaintiff responded
that she thought defendant Pacella should have waited until she
"could confirm that the motion is of record." *Id.* at ¶142. She
also stated that she thought it was a "serious breach" of the
Administrative Assistant's duties not to have provided the
plaintiff with a copy of the order. *Id.*  Defendant Pacella sent
an e-mail to the plaintiff explaining his view of why her
concerns about the identity of the order and the reason it was

forwarded to Harrisburg rather than given to her were unwarranted.  *Id.* at ¶143.  The plaintiff told defendant Pacella his actions in the matter were "more than a little sneaky and at best an insensitive approach." *Id.* at ¶144  The plaintiff insisted on sending a letter to the judge in the *Laubach* case to describe the circumstances of her withdrawal and defendant Pacella told her she was going to draw the sort of attention to herself he thought she wanted to avoid.  *Id.* at ¶145.  The plaintiff also wanted the office's Administrative Assistant, Cherry Saylor, disciplined for not providing the court order to her. *Id.* at ¶146.

On August 15, 2003, pursuant to a request from defendant Barbieri, defendant Pacella prepared and forwarded to Barbieri a detailed analysis of the *Laubach* case which addressed the plaintiff's suspicion of wrongdoing in connection with that matter.  *Id.* at ¶147.  Among other things, Pacella wrote:

> The pattern of conduct set forth in the foregoing paragraph is simply not consistent with the woman I worked with on the daily basis for some six and a half years from July of 1993 through December of 1999.  I find it notable that Rita failed to file a response to the co-executors' May, 2003 Motion to Amend Answer and New Matter to our underlying objections, despite being twice directed to do so by me and once by you, even after you personally worked through detailed revisions to her draft response.  Although Rita can be difficult to work with, she never acted irrational or exhibited the sort of paranoia and insubordination described above.

*Id.* Defendant Pacella also said he was very concerned about the plaintiff's mental and physical well being. *Id.*

On September 18, 2003, the plaintiff expressed doubt in an e-mail about the authenticity of the court order granting her motion to withdraw in the *Laubach* case. *Id.* at ¶148. Defendant Pacella forwarded the plaintiff's e-mail to defendant Barbieri and commented that "it further evidences how fragile I believe her psyche has become." *Id.* at ¶149. He also said, "I really believe Rita needs some help." *Id.*

In an e-mail dated August 29, 2003 and addressed to defendant Pacella, defendant Palmer recounted that he had received a telephone call from a private attorney who said that the plaintiff had visited him earlier in the Summer and accused him of being conspiratorial. *Id.* at ¶150. Defendant Palmer indicated that the attorney felt as if the plaintiff was accusing him of unspecified misconduct and the attorney told him that he was concerned about the plaintiff's emotional state at the time. *Id.* Defendant Pacella spoke with the same attorney on August 29, 2003.

The plaintiff testified that at some point after she returned to work in the Summer of 2003, words that she hadn't written "hopped onto" her computer screen, that she stopped writing e-mails, and that she sat in her office and did nothing, believing it to be "a very dangerous situation." *Id.* at ¶152.

On September 24, 2003, at 3:33 pm, the plaintiff notified Pacella that she intended to forward something to Judge Kelly offering to make herself available to the Court to support her prior position in *Laubach* (although the position to which she is referring is not spelled out in this e-mail). *Id.* at ¶156. Between 3:33 pm and 4:40 pm on September 24, 2003, defendant Pacella responded that the plaintiff did not have his authority or permission to send her draft letter to the court. *Id.* at ¶157. At 4:40 pm on that day, the plaintiff responded by giving her opinion that the question was whether defendant Pacella had filed a document that would protect her "from future disciplinary action and/or professional embarrassment." *Id.* at ¶158. Pacella responded on September 25, 2003 explaining that her appearance was withdrawn in *Laubach. Id.* at ¶159. He also said that he and defendant Palmer:

> consistently supported your desire to raise the issues you felt were appropriate, but also consistently cautioned against making allegations of bad faith or lack of candor to the court without the evidence to support such allegations. Despite our best efforts, however, you filed your March 24, 2003, supplemental objections without our prior review, and despite the fact that no immediate filing deadline precluded our involvement – the gist of your explanation at the time being that the story needed to be told. It is simply unfair to contend that we failed to offer adequate supervision when you failed to avail yourself of it or otherwise refused to accept and/or rejected it when it was offered.

*Id.* Defendant Pacella also described the plaintiff's odd behavior on the case and asked her to honor the fact that she had been removed from it. *Id.* He asked her to respect his

direction that she not pursue any further action in *Laubach* without his express, prior approval. *Id.*

The plaintiff sent the letter to Judge Kelly. *Id.* at ¶160. Upon learning that the letter had been sent against his expressed direction, defendant Pacella told the plaintiff that he notified defendant Barbieri of her action and would be meeting with Barbieri to discuss the matter. *Id.* at ¶161. He also told the plaintiff that there is no need for her to have further access to the file and that she should not disrupt others in the office over the matter. *Id.*

On September 29, 2003, the plaintiff, her husband, defendant Pacella, defendant Minahan, Personnel Director Bruce Sarteschi, and the plaintiff's lawyer met to discuss the view of the office that the plaintiff needed to obtain a psychological evaluation. *Id.* at ¶162.

By an e-mail dated October 7, 2003, to Bruce Sartechi and Susan Dudley, defendant Pacella summarized the plaintiff's behavior. *Id.* at ¶163. Among other things, defendant Pacella stated that the plaintiff's "behavior over the past several months has been especially troublesome and has created an untenable position for the office." *Id.* Defendant Pacella noted a dramatic deterioration in the plaintiff's ability to do her work. *Id.* at ¶164. The plaintiff admits that she was emotionally affected by the actions of the defendants which she characterizes as unethical. *Plaintiff's Amended*

*Counterstatement of Undisputed Material Facts at ¶163.*  She
also admits that she was feeling a deterioration in her ability
to work and that she felt that due to the situation she was
exposed to at work her only option was to sit in her office
with the door closed and say nothing. *Id.* at ¶164.

By letter dated October 7, 2003, defendant Barbieri
directed the plaintiff to contact the State Employee Assistance
Program (SEAP) by the close of business October 10, 2003 to
schedule an evaluation. *Defendants' Statement of Undisputed
Material Facts at ¶165 and the Plaintiff's Amended
Counterstatement of Undisputed Material Facts at ¶165.*  SEAP is
a program provided to Commonwealth employees by the Governor's
Office of Administration, in cooperation with the Pennsylvania
Employees' Benefit Trust Fund.  *Id.* at ¶166.  SEAP is available
to provide a wide range of services to employees, including
counseling services for anxiety, stress, and work-related
problems. *Id.*  The Office of Attorney General had recommended
in late June of 2003 that the plaintiff contact SEAP or a
professional of her choice. *Id.* at ¶167.  The Office of
Attorney General had nothing to do with who the plaintiff saw
once she contacted SEAP. *Id.* at ¶168.

In the October 7, 2003 Barbieri letter, the plaintiff
was told that her failure to adhere to any direction in the
letter would constitute insubordination which would result in
appropriate disciplinary action. *Id.*  Following the plaintiff's
receipt of the October 7, 2003 letter, she responded that she

had seen a SEAP-approved psychologist on October 3, 2003, that
she had been satisfactorily evaluated and certified to return
to work, that she was not authorizing the Office of Attorney
General to contact the psychologist, and that she would not
comply with the directives in the October 7, 2003 letter. *Id.*
at ¶170.   When the plaintiff attempted to return to work on
October 9, 2003, her access to the door was denied. *Plaintiff's
Amended Counterstatement of Undisputed Material Facts at ¶169.*

On October 10, 2003, the plaintiff informed the Office
of Attorney General that she would not comply with the October
7, 2003 directive from Barbieri. *Id.* at ¶171.   She stated that
she was not a threat to herself or others and that she can
perform her duties. *Doc. 33, Exhibit 83.*   She indicated that
she will not participate in the SEAP program but that she will
provide a certificate from a SEAP-approved psychologist
certifying that she is capable of returning to work. *Id.*

A psychologist that the plaintiff saw on October 3,
2003 prepared a report dated October 18, 2003. *Defendants'
Statement of Undisputed Material Facts at ¶173 and the
Plaintiff's Amended Counterstatement of Undisputed Material
Facts at ¶173.*   Due to the fact that the plaintiff's counsel
was on vacation during that period of time, the report was not
provided to the Office of Attorney General until November 20,
2003. *Id.*

On November 24, 2003, defendant Barbieri wrote to the plaintiff to inform her that the evaluation of her psychologist was not in compliance with the October 7, 2003 directive because it was a self-referral and not arranged through SEAP. *Id.* at ¶174.  The plaintiff was directed once again to contact SEAP to schedule an evaluation. *Id.*  The plaintiff called SEAP on December 3, 2003. *Id.* at ¶176.  She was scheduled to see Dr. Barmak. *Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶177.*  The plaintiff testified that all of the doctors repeatedly stated that she has no psychological difficulties. *Id.*

On April 1, 2005, the plaintiff attended a meeting with defendant Barbieri and defendant Pacella.  *Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶183.*  At that meeting, the plaintiff was presented with a letter authorized by Attorney General Thomas W. Corbett, Jr., which terminated her employment effective April 29, 2005. *Id.* at ¶184.  The reason cited for the plaintiff's termination was her failure to follow the directives of defendant Pacella in a case in March of 2005. *Id.* at ¶187.[2]  The plaintiff was removed from the office on April 1, 2005 and given the opportunity to resign. *Id.* at ¶185.  The plaintiff tendered a forced resignation on April 27, 2005. *Id.* at ¶186.

---

[2] It is not clear from the record in this case the date that plaintiff resumed working in the Office of Attorney General after the events in October, November and December of 2003.

IV.  First Amendment Law and Analysis.

     The plaintiff claims that the defendants took adverse
actions against her because she spoke out on matters of public
concern.

     "A public employee has a constitutional right to speak
on matters of public concern without fear of retaliation."
*Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001).
Public employers cannot silence their employees simply because
they disapprove of the content of their speech. *Id.* at 194.
On the other hand, "the State has interests as an employer in
regulating the speech of its employees that differ
significantly from those it possesses in connection with
regulation of the speech of the citizenry in general."
*Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968).  "The
problem in any case is to arrive at a balance between the
interests of the [employee], as a citizen, in commenting upon
matters of public concern and the interest of the State, as an
employer, in promoting the efficiency of the public services it
performs through its employees." *Id.*

     A public employee's claim of retaliation is evaluated
under a three-step process. *Green v. Phila. Hous. Auth.,* 105
F.3d 882, 885 (3d Cir. 1997).  First, the plaintiff must
establish that the activity in question was protected. *Id.*
Second, the plaintiff must establish that the protected
activity was a substantial or motivating factor in the alleged

35

retaliatory action. *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir. 1996).  Lastly, the public employer can rebut the claim by demonstrating that it would have reached the same decision even in the absence of the protected conduct. *Baldassare, supra,* 250 F.3d at 195.

Determining whether the speech in question was protected by the First Amendment involves a two-step process.

First, to qualify as protected speech, the speech in question must involve a matter of public concern. *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003).  "If the speech in question is purely personal, it does not fall under the protective umbrella of the First Amendment and public employers are therefore not limited by that guarantee in responding to disruption caused by the expression." *Id.*  "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Id.* (quoting *Baldassare, supra,* 250 F.3d at 195).  "[S]peech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Id.* (quoting *Connick v. Myers,* 461 U.S. 138, 148 (1983)).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick, supra,* 461 U.S. at 147-48. "Determining whether a public employee's speech is a matter of

public concern is a question of law for the court." *Brennan,*
*supra,* 350 F.3d at 413.

The defendants concede that some of the plaintiff's
speech was on matters of public concern.  Accordingly, we move
to the next step of the analysis - balancing of interests.

If the plaintiff can establish that her speech was on a
matter of public concern, the court proceeds to the second step
of the process of determining if the speech is protected
activity. *Brennan, supra,* 350 F.3d at 413.  The plaintiff must
demonstrate that her interest in the speech outweighs the
state's countervailing interest as an employer in promoting the
efficiency of the public services it provides through its
employees. *Id.*   "This inquiry is purely legal and is therefore
decided by the court as a question of law." *Id.*   The court
must balance the speaker's First Amendment interest against
injury the public employer may suffer as a result of the
speech. *Id.*

On the one side, we weigh the public employee's
interest in speaking about a matter of public concern and the
value to the community of her speech. *Id.*   "Balanced against
these interests is the government's interest as an employer in
promoting the efficiency of the services it performs through
its employees." *Id.* (quoting *Azzaro v. County of Allegheny*,
110 F.3d 968, 980 (3d Cir. 1997)). "[N]o single factor involved
in this balancing is dispositive; they are all 'weights on the

scales.'" *Baldassare, supra,* 250 F.3d at 198 (quoting *Zamboni v. Stamler,* 847 F.2d 73, 79 (3d Cir. 1988)). "Only if the value of the speech, as measured by the employee's and public's interests, is outweighed by the government's interest in effective and efficient provision of services, will [a court] hold that the speech is unprotected." *Brennan, supra,* 350 F.3d at 413.

"On the employee's side of the balance, the public's interest in exposing potential wrongdoing by public employees is especially powerful." *Baldassare, supra,* 250 F.3d at 198. "Speech involving government impropriety occupies the highest rung of First Amendment protection." *Id.*

In the instant case, the plaintiff was accusing her superiors of improper and unethical conduct. However, she did not provide concrete understandable statements of what the defendants had done that was improper or unethical. Thus, although speech exposing wrongdoing by public employees generally weighs heavily in favor of finding that the speech was protected activity, the plaintiff's failure to clearly articulate or describe any wrongdoing lessens the weight to be given to her statements in the balancing that the court must conduct.

On the employer's side of the balance, the court must consider the nature of the relationship between the employee and employer as well as any disruption the employee's speech

caused. *Brennan, supra,* 350 F.3d at 413.  The court should consider whether the speech: (1) impaired discipline by superiors; (2) impaired harmony among co-workers; (3) had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (4) impeded the performance of the speaker's duties; or (5) interfered with the regular operation of the enterprise. *Versarge v. Township of Clinton,* 984 F.2d 1359, 1366 (3d Cir. 1993). "The key question under *Pickering* . . . is whether the employment relationship has been seriously undermined." *Sprague v. Fitzpatrick*, 546 F.2d 560, 566 (3d Cir. 1976).

In the instant case, the plaintiff's speech caused significant disruption in the Office of Attorney General.

The disrespectful and insubordinate nature of the plaintiff's speech is striking.  The plaintiff did not just accuse her superiors of wrongdoing, she did so using insulting and inappropriate language.  "How one says something, in addition to simply what one says, can undermine the morale and close working relationships essential to a productive workplace."  *Love-Lane v. Martin,* 355 F.3d 766, 797 (4th Cir. 2004)(Wilkinson, J. dissenting).

"In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important." *Baldassare, supra,* 250 F.3d at 198. *See also Swineford v. Snyder County,* 15 F.3d 1258, 1272-73 (3d

Cir. 1994)("Proximity within an organizational hierarchy is a
significant factor in the employer's demonstration that a
public employee's speech had a detrimental impact on a
necessarily close working relationship.")

The plaintiff's speech seriously undermined, if not
completely destroyed, the employment relationship between the
plaintiff and defendant Palmer, her immediate supervisor.  The
plaintiff herself rejected an assignment because she claimed
she could not work with defendant Palmer and she asked not to
be made to sign on to another case with him.  On April 18,
2003, defendant Pacella expressed that he doubted that the
plaintiff and defendant Palmer could ever effectively work
together.  Also, on June 18, 2003, defendant Pacella expressed
concern that he himself had lost his relationship with the
plaintiff.

The plaintiff's hostility toward the defendants spread
to others in the office.  The plaintiff attempted to have
Cherry Saylor, an administrative assistant, disciplined for
following the orders of defendant Pacella.

The plaintiff's speech impaired discipline by
superiors.  The plaintiff believed that her speech was of such
importance that she refused to follow the directives of her
superiors.  For example, the plaintiff persisted in sending a
letter to a judge that her superior had specifically ordered
her not to send.

40

Balancing the interests of the plaintiff and of the public in the plaintiff's speech against the interests of the Office of Attorney General as an employer, we conclude that the disruptiveness of the plaintiff's speech outweighs the First Amendment value of that speech.  Accordingly, the defendants did not violate the First Amendment by taking adverse actions against the plaintiff on the basis of her speech, and it will be recommended that the defendants be granted summary judgment.[3]

Based on the foregoing, it is recommended that the defendants' motion (doc. 29) for summary judgment be granted and that the case file be closed.

                                    **/s/ J. Andrew Smyser**
                                    J. Andrew Smyser
                                    Magistrate Judge

DATED:  June 28, 2005.

---

[3] Given the conclusion that the disruptiveness of the plaintiff's speech outweighed the First Amendment value of that speech, we do not consider the defendants' argument that they are entitled to summary judgment because the plaintiff's speech was not a substantial or motivating factor in their actions or their argument that they would have taken the same actions against the plaintiff regardless of her speech.

41